JOHN T. AYERS et al.

vs.

CHARLES H. AYERS et al.

*Sale by Trustees—False Report as to Price—Evidence.*

A partition sale made by trustees appointed for the purpose *held* not to have been falsely reported by them as made at a price less than that actually received, although payment was not made by the purchaser until two years after the sale, when he made a resale at an advance in price, and a portion of such advance was paid to one of the trustees, it appearing that such payment was made for legal services rendered the original purchaser in connection with the resale and other matters.

*Decided January 9th, 1923.*

Appeal from the Circuit Court for Queen Anne's County (HOPPER, J.).

Petition by J. T. Ayers and Jeremiah Ayers against Thomas J. Keating and James T. Earle, trustees appointed to make sale for purposes of partition. From an order dismissing petition, petitioners appeal. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, URNER, STOCKBRIDGE, and ADKINS, JJ.

*W. Ashbie Hawkins,* with whom were *Hawkins & McMechen* on the brief, for the appellants.

*James U. Dennis,* for the appellees.

ADKINS, J., delivered the opinion of the Court.

This is an appeal from the order of court in the case of Jeremiah Ayers and wife, John T. Ayers and wife and William Wesley Ayers and wife vs. Charles H. Ayers and wife, dismissing the petition of John T. Ayers and Jeremiah Ayers to have the order ratifying the audit in said case striken out, and to require the trustees to have a new audit stated in which they shall be charged with eight hundred dollars as the true amount of proceeds of the sale made by them, instead of five hundred dollars which they reported and which is distributed in said audit.

Inasmuch as the charge here is of fraud and bad faith, and reflects upon the good name of two reputable members of the bar, it is important that the material facts should be stated. We have examined carefully the record, and, as we find all the essential facts so fairly and clearly stated in the able opinion of the late JUDGE HOPPER, who sat in the case below, and as we concur in the conclusions he reached, we have adopted his opinion as that of this Court. The opinion is as follows:

"The bill of complaint was filed in this case on April 27, 1916. It prayed for a sale for partition on the ground that the land mentioned therein was not susceptible of division without loss and injury to the parties. The land described therein consisted of two lots divided by a public road, one on the right of it containing nine or ten acres and having no buildings on it; the other on the left of it containing three or four acres and having a small frame dwelling and barn on it. There were four concurrent owners named, three of whom, with their wives, are plaintiffs and the other and his wife are defendants, whose answer admitting the allegations of the bill and consenting to sale, was filed May 1, 1916. Two witnesses testified in support of the bill and as to value of the land. One of them, Charles Wright, having no interest in it, valued the lot on the right of the road at 'about $240,' and that with the house on it at 'about $350'; the other, Charles H. Ayers, defendant, valued the lot on the

right of the road at 'about $275,' and that with the house on
it at 'about $300.' The decree for sale was passed June 5th,
1916, and Thomas J. Keating and James T. Earle were
thereby appointed trustees to make the sale. After filing
their bond, duly approved, and after due advertisement of
time, place, and manner and terms of sale, they offered the
property at public auction on July 11, 1916. They filed a
report of sale on December 9, 1916, in which they set forth
their efforts to make public sale of the property, and reported
they had withdrawn the same because the highest bid made
was for $450, which they deemed inadequate, and that they
then and there announced they would sell it at private sale.
The report further sets forth that they afterwards sold the
property at private sale to William Wesley Ayers for $500,
subject to ratification, and attached· thereto the purchaser's
written authority to report him as purchaser at that price.
Upon that report an order of ratification *nisi* of the 'private
sale made and reported by' the trustees was passed, being
signed by the judge sitting in the case, and was duly pub-
lished as its terms required. No exceptions were filed. An
order finally ratifying this sale was passed by the same
judge on October 31, 1918. The purchaser paid no part
of the purchase money until November 1, 1918, when he
paid the whole of it.

"On November 27, 1918, the auditor filed his report and
account, distributing $500 to costs and those entitled to it.
This audit was finally ratified December 30, 1918. No
exceptions were filed to it.

"The distributees refused to accept the amounts respec-
tively awarded to them by this audit.

"On June 7, 1919, J. T. Ayers and Jeremiah Ayers, two
of the plaintiffs in the original bill and distributees, filed a
petition in this .case, alleging that the trustees had not
reported the true amount of proceeds of their sale; that,
instead of having charged themselves with $500, as they had
done, they should have charged themselves with $800 which
they claimed. was the true amount of proceeds received by

them for sale of their trust estate. They prayed that the audit be opened, the trustees required to account for $800 and a new audit stated, distributing this amount. Thier petition was dismissed by me. The order dismissing it was reversed by the Court of Appeals and the matter remanded for trial. Thereupon the trustees answered the petition, denying its allegations and averring they had sold the property for $500, had received nothing more for it and were not chargeable with $800.

"The case came forward for hearing on the petition, answer and testimony taken, and after oral argument by counsel for each side, and the filing of briefs by each side, it was submitted.

"I think this case turns on the question of the *bona fides* of the private sale which the trustees report they made to Wm. Wesley Ayers for $500.

"About the private sale, Wm. Wesley Ayers is the only witness who testified for the petitioners. He said on direct examination he never bought the property and never paid the trustees for it. On cross-examination he gives the reason for this denial. To a cross-question referring to his signature to the letter of authority to trustees to report him as the purchaser of the property attached to their report of sale, he answered, 'Why, of course, while my signature may be on that letter how could I be a purchaser when no money had been paid by me?' He gives no other reason why he was not the purchaser anywhere. He does not deny his signature to that letter. He did not say he did not understand it when he signed it or that he did not then intend to buy the property and did not understand he was buying it. He does not claim he was induced by the trustees to sign that letter or that they suggested to him to buy the land. He does not undertake to say why he signed it if he was not then buying the property. It is true he did not pay any part of the purchase money until after the sale to Deaton, but the delay in paying for it did not relieve Ayers from liability for the purchase money he had agreed to pay and

did not void the sale. There is no shadow of evidence that he ever asked to be allowed to withdraw his offer or suggest that a purchaser be found to take his place. In dealing with the proceeds of sale to Deaton, Wm. Wesley Ayers, on November 1, 1918, wrote to Mr. Earle as follows: 'I hereby authorize you to retain $150, out of any money that comes into your hands from Arthur L. Deaton for me as purchase money on the property sold by you to him. You will turn over to yourself and Mr. Keating, trustees, $500; forward me $150 and retain $150 as above stated. Witness my hand and seal the day and year first above written, W. W. Ayers. (Seal) Test: James T. Bright.' In this document he disposes of the whole amount Deaton paid for the property.

"For the respondents, Thomas J. Keating and James T. Earle, both reputable men and attorneys in good standing at the bar, testified they sold the property to Wm. Wesley Ayers as stated in their report without conditions, but subject to ratification by the court. The order of ratification *nisi* was promptly passed by me and duly published. Ordinarily, orders of ratification *nisi* are issued by the clerk of the court, but in cases of private sales like the one I am dealing with here, it is not unusual to have a judge sign the order so that the purchaser may feel some assurance that the same judge will finally ratify the sale if no exceptions be filed. I would have ratified this sale at any time after expiration of time for filing exceptions upon request, if no exceptions had been filed. It is not an unusual thing here for trustees to withdraw property offered at public sale for want of sufficient bid, and then sell it at private sale subject to ratification of court, and the practice is to confirm such sales if no exceptions be filed. It does not appear that the trustees sold the property in this case much, if any, below its real market price at the time it was sold. The witness Wright appraised it at 'about $590' and the witness Charles H. Ayers at 'about $575' in their testimony supportive of the original bill, and the testimony taken in this proceeding shows that John M. Perry on the day this prop-

erty was withdrawn from public sale, offered the trustee $500 for it after its withdrawal, but withdrew the offer before its acceptance. He is well known to me. He owns valuable real estate of large acreage in the neighborhood of the property involved in this case and knew the value of property there. He was more than able to pay for it. I therefore think his offer approximates at least the worth of this property in the fall of 1916. There is no testimony that there was then any reason to believe that this property would become more saleable or more valuable in the near future. There is not the least evidence in the case that the trustees, or either of them, had at the time of their sale to him any understanding with Wm. Wesley Ayers that he should become ostensible purchaser of the property and hold it for an advance and share the profit with them, and no such thing existed then or afterwards.

"James T. Earle testified he often demanded the purchase money of Wm. W. Ayers, and he does not contradict him, but says he does not recollect any demands for it.

"I have found nothing in the testimony and nothing in the circumstances of this case that will support the conclusion that Wm. Wesley Ayers did not buy the land the trustees reported they sold to him, and nothing in the same that will sustain a charge that the trustees did not act in perfect good faith in selling the land to him in the manner they did sell it to him. Everything they did in the matter followed the practice and precedure in such matters in this court.

"Perhaps it might have been better if they had procured an earlier final ratification of the sale. If they had done so, they would have put themselves in position to obtain an order of resale at any time thereafter at risk of Ayers. But if this course had been pursued and a resale made and the proceeds thereof had been greater than the original sale, trustees would have had a right only to enough thereof to pay costs, including resale expenses, and what was due them on the original purchase money. Ayers would have been entitled to the surplus. If the proceeds of a resale had been less

than costs and what was due on the original purchase money, Ayers would have been liable for the deficit. In the first of these contingencies the petitioners would not have benefited; in the other, they would have suffered loss, probably. Often it is difficult to decide which is the better course in the collection of deferred purchase money, force or indulgence. But at no time after filing their report of sale had the trustees any right to accept and substitute anyone as purchaser in the place of Ayers, because of his default, without his consent and order of court. It has not been shown that Ayers ever consented to have anyone substituted for him, or that he ever repudiated the sale until he did so on the witness stand. No order of substitution was ever asked for or given.

"How the sale was made to Deaton is shown by the following: Deaton testified he knew all the parties to the suit, that he purchased this property in November, 1918, for $800 and paid the money to James T. Earle. He was asked to 'state briefly how it was that you came to buy this property?' (seventh direct interrogatory), and answered, 'Well, it was for sale and I liked it and I interceded to see if I could buy it. I wrote to Wm. W. Ayers about it, and he told me to see Mr. James T. Earle, that Mr. Earle would fix me up and that I could settle for the property with him.'

"On cross-examination he testified as follows: Sixth cross-interrogatory: 'Did you and Wesley Ayers agree on the price before you came to my office?' (Mr. Earle's office) Ans. 'Yes, sir.' Eighth Cross-interrogatory: 'You have stated that you had no communication with me concerning the purchase price before you came to my office. Had you communicated with reference to that purchase price with anyone except Wesley Ayers?' Ans. 'No, sir; because he was the only one I knew that was concerned in the property at that time, and I wrote to him and he sent me to Mr. Earle as one of the trustees.' Tenth cross-interrogatory: 'When did you first begin to negotiate with Wm. W. Ayers for the purchase of the property?' Ans. I can't exactly state the

date, but it was some time in September.' Eleventh cross-interrogatory: 'With whom did you make your agreement for the purchase of the property described in the deed to you from W. W. Ayers and his wife as to the price at which you were to purchase the property?' Ans. 'I made the agreement with Wesley Ayers. When we agreed on the price it was with Wesley Ayers; there was no great arrangement made, for I knew the property was for sale; we only figured on what he would take for the property; that was the only arrangement made.' Twelfth cross-interrogatory: 'Was it or not after you and Wesley Ayers had agreed upon the price in the fall of 1918 that you took the matter up with Mr. James T. Earle and requested a loan of five hundred dollars to be secured by a mortgage?' Ans. 'As soon as we agreed on eight hundred dollars he sent me to Mr. Earle; we never went any further. He sent me right to Mr. Earle to settle with. This was after Wesley and I agreed on the price. I then went to Mr. Earle and, talking with Mr. Earle, found I had to borrow some money, and he offered to let me have it, and, as he wanted the job, I told him I would just as leave get it from him, and I borrowed it from him and Mr. Keating, and gave them the mortgage to secure it.'

"On redirect examination he testified he gave the mortgage to them 'individually' and that it had been paid.

"Wm. Wesley Ayers testified very little about this sale. He said he and his brothers received letters from several persons offering to buy the property, and they agreed to take $800 for it. Arthur L. Deaton was one of those offering that price, and he wrote to Mr. Earle that they had a purchaser at that price and he wrote to witness to send him to him. He said he did not expect to profit by the sale until Mr. Earle told him the $300 advance was his, and he replied his brothers would not be satisfied with that settlement. He took $150 of the advance and paid Mr. Earle $150 of it. He said he did not remember any demands having been made on him before this time for the $500 purchase money. He was then asked (seventh cross-interrogatory): 'Did not Mr.

Earle enclose you a mortgage to be executed in order to take
care of a part of this purchase money as far back as in the
fall of 1916?' Ans. 'I recall that he sent me a mortgage to
be signed by my brothers and myself, but we did not sign it,
but sent it back to him.'

"He testified he did not receive a deed for the property
from the trustees and couldn't say whether he read the deed
he gave to Deaton for it or not, although he took it to Wil-
mington to be signed by his wife. He has never offered to
pay the $150 he got over to the trustees or to divide it with
his brothers. None of his brothers were called to witness
stand for any purpose.

"James T. Earle, after detailing the facts and circum-
stances of the sale of the property to Wm. Wesley Ayers in
1916 by the trustees, testified further as follows: 'This sale
was duly reported and order *nisi* issued, and, as trustee, I
notified the purchaser, Wm. Wesley Ayers, that the trustees
were ready to receive the purchase money and requested him
to make settlement. The case stood in this form for almost
two years, during which time I made, as trustee, repeated
efforts to get a settlement from the purchaser, Wm. Wesley
Ayers, but without success. In October, 1918, Wm. Wesley
Ayers advised me, as trustee, that he had a prospective pur-
chaser for this place if the purchaser could arrange the money
satisfactorily, and the prospective purchaser was Arthur L.
Deaton. Wm. Wesley Ayers requested me to help him to
make the sale to Deaton. I requested Wesley Ayers to send
Deaton to my office, which he did about the last of October,
1918. I discussed finances with Deaton and found he needed
money to buy the property and told him he could raise it on
mortgage. I wrote to Wesley to come to see me at an early
date. On October 31, 1918, after nearly two years' interval,
I had the sale to Wm. Wesley Ayers finally ratified, and on
November 1 of same year Mr. Keating and I, as trustees,
executed unto Wm. Wesley Ayers, in consideration of the
purchase price of $500, a deed for the property. Wm. Wes-
ley Ayers and Arthur L. Deaton were present and were

Md.]

shown the deed, which deed I held pending the return to me
from Wm. Wesley Ayers of a deed to be executed by him and
his wife to Arthur L. Deaton, to whom he, Wm. Wesley
Ayers, had sold the property. Both of these deeds were pre-
pared by me, and Wesley took the deed which I had drawn
from him and his wife to Deaton to Wilmington so that his
wife might unite with him in the execution of the same.
When the deed from Ayers to Deaton was returned to me I
notified Arthur L. Deaton, and he and his wife executed a
mortgage in order to secure a part of the purchase money
for the purchase by him from Wm. Wesley Ayers. The five
hundred dollars purchase money due by Ayers to the trustees
was paid by Deaton, Ayers having been previously advised as
to the method of settlement. I did not know Arthur L.
Deaton in the case as prospective buyer until he was sent
to me by Wesley Ayers, nor did I know the price agreed upon
between Ayers and Deaton until I was informed of that price
by one or the other of them in my office. Wm. Wesley Ayers
directed me, in writing, on November 1, 1918, to pay over
to myself and Mr. Keating, as trustees, the sum of five hun-
dred dollars, and requested me to forward him $150 and re-
tain $150 for myself. I herewith file the order I have just
spoken of with the examiner, marked J. T. E., Exhibit No. 1,
as part of this testimony. On November 1, 1918, and while
Wm. W. Ayers was in my office, I wrote Jeremiah Ayers that
Wesley had made settlement with us * * * in accordance with
the return by the trustees to the court, and that distribution
would be made within a reasonable time thereafter. On
December 31, 1918, I wrote to Wm. W. Ayers and sent him
a release to be executed by the brothers, stating that the audit
showed the amount of $84.81 to be distributed to each heir,
and that upon return of the release properly executed checks
would be mailed. They 'refused to execute the release and
accept the amount awarded to them by the audit.'

"Thomas J. Keating testified the trustees endeavored to
make private sale of this property but failed to do so until
the offer in writing was received from Wm. Wesley Ayers,

and, after consultation with Mr. Earle, this offer was reported to the court and the trustees were authorized to accept Ayers' offer of $500. The order *nisi* on this sale was duly published, but no purchase money was received from Wesley Ayers, although numerous requests were made for settlement. Finally, in October, 1918, I suggested to my co-trustee that the matter be settled by Wm. Wesley Ayers or we would resell the property at his risk. In the latter part of that month I was informed by my co-trustee that Wesley Ayers had arranged to make sale of the property to Arthur L. Deaton, and he requested me to join in making a loan to Deaton, which I agreed to do. I did not know the price agreed upon between Deaton and Ayers until after the deed had been executed by Wesley Ayers and his wife to Arthur L. Deaton. Mr. Earle advised me that the original purchase price of $500 was authorized by Wesley Ayers to be paid over to the trustees. With this understanding I executed the deed to Wesley Ayers to be delivered when the trustees received the $500 due them as purchase money. This purchase money was duly deposited to the credit of the trustees jointly and was the entire amount received by them so far as I know. I received no part of any other purchase money either directly or indirectly, and had no connection whatever with any sale by Wesley Ayers to Arthur L. Deaton.

"I have recited the testimony about this sale at length because I think it proves conclusively that the trustees did not make the sale, were not entitled to receive the proceeds of it, and did not receive any part of them except in payment of the $500 due them from Wm. Wesley Ayers on account of the sale made to him in the Fall of 1916. Ayers had a right to sell the property at profit or loss as he might be able. He sold at profit and had the right to take his profit. He could have divided it with his brothers if he had chosen to do so, but they could not have forced him to divide it. It is true that Mr. Earle got a fee out of these profits, but it was paid to him by Ayers for his services in the matter of a sale between Ayers and Deaton and other matters, as it appears by

the evidence.  His employment as attorney in this matter was not inconsistent with his duty as trustee; it did not require him to act against the interest of his trust estate.  His fee was not paid with trust money or with money that the trustees or the petitioners could have demanded to be paid to them.  He deprived them of nothing by accepting it.  Mr. Keating had no knowledge of the sale until after it had been consummated and had absolutely no connection with it except to lend money to Deaton to pay for the property he had bought before the loan was made by him.

"I am satisfied the trustees have acted in absolute good faith in the execution of their trust, and that they are neither legally nor morally liable for any part of the profit made by Ayers on his sale to Deaton."

In the concluding clause of the opinion, which is here omitted, JUDGE HOPPER calls attention to the failure of the trustees to collect interest on the purchase money from William Wesley Ayers, the purchaser, and states that as the share audited to him is still in the hands of the trustees he will in the order to be signed direct the trustees to reduce that share by three-fourths of the amount of interest which should have been collected and to add to the amount audited to each of the other three heirs one-third of the amount deducted from the purchaser's share as aforesaid.  And this direction is included in said order as passed.

For reasons stated in the above opinion the order appealed from will be affirmed.

*Order affirmed, with costs to appellees.*